IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 13, 2024 Session

## STATE OF TENNESSEE v. EMILY ASHTON WILLIAMS AND JOEL SCOTT SWEENEY

**Appeal from the Criminal Court for Davidson County**
**No. 2018-D-2540    Jennifer Smith, Judge**

_____

### No. M2023-00606-CCA-R3-CD[1]

_____

In this consolidated appeal, the defendants, Emily Ashton Williams and Joel Scott Sweeney, appeal their Davidson County Criminal Court jury convictions of aggravated child neglect. Defendant Sweeney argues that the evidence was insufficient to support his conviction, that the trial court committed plain error by failing to require the State to make an election of offenses, and that the trial court erred in sentencing him. Defendant Williams argues that the evidence was insufficient to support her conviction. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TIMOTHY L. EASTER, J., joined.

Nathan Cate (at trial) and Jay Umerley (on appeal), Nashville, Tennessee, for the appellant, Emily Ashton Williams.

Fred Standbrook, Whites Creek, Tennessee (at trial), and Sean McKinney (at motion for new trial hearing) and Manuel B. Russ (on appeal), Nashville, Tennessee, for the appellant, Joel Scott Sweeney.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman and Jeffrey George, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

---

[1]    The defendants were tried together but filed separate notices of appeal, generating separate case numbers. Appellate case number M2023-00630-CCA-R3-CD has been consolidated with this case number.

The Davidson County Grand Jury charged the defendants in a 51-count indictment with an array of charges of aggravated child abuse, aggravated child endangerment, and aggravated child neglect for offenses against Defendant Williams' one-year-old daughter. Defendant Williams was charged with 17 counts of aggravated child abuse of a child age eight or less, 15 counts of aggravated child endangerment of a child age eight or less, and one count of aggravated child neglect of a child age eight or less. Defendant Sweeney was charged with 17 counts of aggravated child abuse of a child age eight or less and one count of aggravated child neglect of a child age eight or less.

Before trial, the court granted the defendants' motions to sever each count of the indictment, and the State elected to pursue the charge of aggravated child neglect of a child eight years or less against each defendant—Counts 50 and 51 of the indictment—in the trial that is the subject of this appeal.[2]

At the four-day trial, Detective Elizabeth Mills of the Metro Nashville Police Department ("MNPD") testified that she responded to Vanderbilt Children's Hospital ("the hospital") at approximately 7:00 a.m. on the morning of July 14, 2018, in response to a report from the Department of Children's Services ("DCS") of physical abuse of a child. When she first saw the victim, she noticed that the victim "was very badly injured. . . . [H]er eyes were very swollen shut[,] . . . . She had bruises o[n] her face, her arms, her legs. Very skinny. Thin hair." Photographs of the victim's injuries were exhibited to the jury. Detective Mills described the victim's injuries as bruising to her eyes, forehead, face, collarbone, arms, legs, knees, wrist, hand, elbow, and shoulder; cuts to her forehead, nose, "all over her face," ears, arms, legs, right knee, and right shoulder; and "very thinning" hair.

Detective Mills said that she and Roger Harrell, a DCS employee, interviewed Defendant Williams, the victim's mother, which interview was audio recorded. Detective Mills described Defendant Williams as exhibiting "a wide range of demeanors," saying that Defendant Williams was "asking questions, trying to figure out what was going on. If anything accusatory was asked, she became angry, . . . [and] seemed to be more worried about getting jobs and . . . doing other things than getting her child to the hospital to see a doctor." Detective Mills also said that Defendant Williams "didn't really have an explanation that would explain anything, and so she became frustrated . . . when I was trying to get an explanation."

Detective Mills also interviewed the victim's biological father, Stephen

_____

[2] Before trial, the aggravated child neglect charges were renumbered Counts 1 and 2 before being presented to the jury.

Williams, whom she described as being "pretty calm when he got there" and "very upset once he found out the condition his daughter was in." She noted that Mr. Williams had not seen the victim "in a few months" and "had no idea that she had all of these injuries." She said that Mr. Williams was very cooperative with the investigation.

During cross-examination by Defendant Sweeney, Detective Mills said that Defendant Williams "denied several times" that Defendant Sweeney assaulted the victim.

During cross-examination by Defendant Williams, Detective Mills reiterated that Defendant Williams' explanation of events "was not consistent with . . . [the victim's] injuries."

MNPD Officer Geoffrey Daugherty testified that on July 11, 2018, at 11:30 p.m., he responded to an anonymous call for a welfare check of a one-year-old child who "had bruises and marks" at the Kings Inn at 2400 Brick Church Pike. Defendant Williams answered the door and confirmed that there was a child in the room. Officer Daugherty said that he saw a man in the room and saw a child asleep in a bed. The child was clothed with her face "in the pillow or comforter," and Officer Daugherty "noticed that the child was breathing because I s[aw] the stomach going up and down." He said that he "didn't see anything out of the ordinary on the child." He acknowledged that the lighting in the room was "not the best," that he could see "[v]ery little" of the child's face, and that the rest of the child's body was "covered by pajamas or clothes." He said that he did not see injuries on the child as shown in the photographs taken on July 14, 2018.

During cross-examination by Defendant Williams, Officer Daugherty testified that Defendant Williams was cooperative during the welfare check. He reiterated that he did not believe that the child needed medical care at that time.

Roger Harrell, an investigative specialist with DCS, testified that he responded to the hospital at approximately 1:30 or 2:00 a.m. on July 14, 2018. When he first saw the victim, he was "unable to tell if she was conscious or not because her eyes were swollen together so bad." Based on the extent of the child's injuries, he told a nurse "that there had to be hospital staff in the room as long as the mother was there until we found out more about what was going on." He then called law enforcement and requested a detective come to the hospital. He interviewed Defendant Williams at the hospital with Detective Mills. The jury listened to the audio recorded interview.

During the interview, Mr. Harrell talked to Defendant Williams about finding a safe placement for the victim as an alternative to placing the victim in State custody. He explained to Defendant Williams that this was necessary because the victim had extensive

injuries that had not been adequately explained. Detective Mills then questioned Defendant Williams who said that she and the victim lived with Defendant Sweeney at the Kings Inn. Defendant Williams said that she and Defendant Sweeney had been dating for approximately one year and that they moved from Clarksville to Gallatin where they had lived on a docked houseboat. After three months on the houseboat, they moved to the Kings Inn in Nashville, approximately five to six weeks ago. Defendant Williams said that when they lived on the boat, the victim slept on a "v-shaped" bed in the hull of the boat and that on several occasions, the victim fell out of the bed. She said that the victim sustained bruises from falling out of the bed, calling it a "hefty fall." She said that she and Defendant Sweeney worked for Defendant Sweeney's mobile detailing company. She said that Defendant Sweeney's truck was in the hospital parking garage but that Defendant Sweeney did not come to the hospital with her. She told Detective Mills that the victim's father was "not in the picture" and had never been in the picture. She said that she and Mr. Williams had separated "not long after I found out I was pregnant" with the victim and that they were "going through a divorce."

In explaining the events that led to the victim's hospitalization, Defendant Williams told Detective Mills that on July 11, 2018, between 12:00 and 6:00 p.m. "we were walking on the sidewalk" when the victim fell "face first on the concrete with her little butt up in the air." She said that the "only immediate marks" the victim had were some "scuffs on her nose." She said that the victim whined a little bit but then "dusted it off" and began walking again. That night before bedtime, the victim had "a little goose egg." Defendant Williams said that police officers came to the hotel late on the night of July 11 for a welfare check on the victim. She said that she talked to the officers, they saw the victim, and they left. When the victim woke up the next morning, she had "a little discoloration across her forehead" that looked like a yellowish bruise that was "going away." Defendant Williams said that she did not take the victim to the doctor because the bump was relatively small and the victim was acting normally. On the morning of July 13, the victim woke up with a "dark ring" around her right eye, and the eye was swollen shut. Defendant Williams said that she immediately put ice on the victim's eyes and agreed with Defendant Sweeney that "after we get through doing the running that we need to do today, we need to take her to the doctor."

Defendant Williams told the detective that the victim did not stay alone with anyone, including Defendant Sweeney, saying, "she's my little shadow." She said that she and Defendant Sweeney had things that they had to take care of on July 13 for a big job opportunity. She said that they took the victim with them to meet potential clients in Clarksville but that the victim stayed in the vehicle while the co-defendants took turns waiting with the victim. Defendant Williams was concerned that Detective Mills was going to contact the potential client and impede the business opportunity. Defendant

-4-

Williams said that after they left the potential client, they went to Taco Bell in Clarksville then to Walmart. They then drove back to the Kings Inn briefly, before bringing the victim to the hospital.

Defendant Williams adamantly denied that Defendant Sweeney had harmed the victim, saying, "Nobody put their hands on my child." She said that Defendant Sweeney was the only "father figure" the victim had ever known. She said that on one occasion, she had even told Defendant Sweeney to "pop her hand" when the victim gets into his work organizer but that Defendant Sweeney refused because "she's not my child," "it's not my place to physically discipline her." Defendant Williams said that she disciplined the victim by using timeout, a "small pop on the back of the hand," or a "pop on the diaper."

When Detective Mills told Defendant Williams that the victims' falling did not explain the broken femur, Defendant Williams said, "I don't know how to explain that" and said that the victim did not indicate that her leg "bothered her." Defendant Williams denied that anything happened to the victim other than the fall and reiterated that the victim had not been alone with anyone else. She recalled that the victim fell in a gravel parking lot, landing on her knees two to three weeks prior and said that because the victim was young, she routinely fell from "trip[ping] over her own two feet." Defendant Williams said that on the morning of July 13, it seemed as if the victim's "balance was off" but that she did not indicate that she had any pain in her leg. Defendant Williams said that the victim had not been to the doctor since her 18-month checkup at her primary care provider.

Mr. Harrell testified that while he was in the process of finding a safety placement for the victim, Mr. Williams arrived. Mr. Harrel and Detective Mills interviewed Mr. Williams who "had no idea what was going on." When Mr. Williams was allowed to see the victim, "[h]e was devastated," "very emotional," and "[v]ery angry" at her condition. DCS "cleared" Mr. Williams to take the victim home after she was discharged from the hospital.

Through the course of his investigation, Mr. Harrell learned that another DCS employee, Darlene Sistrunk, had visited the victim at the Kings Inn on July 13, 2018, and had photographed injuries to the victim. Those photographs showed the victim with bruising and swelling to her eyes and "additional swelling on the top right of her forehead." Mr. Harrell said that Ms. Sistrunk instructed Defendant Williams to take the victim to the hospital "to get checked out right away." Mr. Harrell said that on one occasion, he was at the courthouse with the victim and Mr. Williams for a hearing when the victim saw the defendants and got a look of "just pure unadulterated fear" and "jumped in to her daddy's arms."

During cross-examination by Defendant Sweeney, Mr. Harrell said that Defendant Williams' "behavior was not normal for someone that their daughter was laying there in that condition" but acknowledged that she answered all of the questions during the interview. He acknowledged that when the victim saw the defendants at the courthouse, she had been in Mr. Williams' "care for a while."

During cross-examination by Defendant Williams, Mr. Harrell said that when he arrived at the hospital, Defendant Williams was in the room with the victim but that Defendant Sweeney was not there. He said that Defendant Williams voluntarily agreed to be interviewed. Initially, Defendant Williams explained the victim's injuries by saying that the victim fell. Mr. Harrell said that Defendant Williams offered no explanation that accounted for the victim's fractured femur or the extent of her injuries. He said that Defendant Williams did not appear to prioritize the victim's welfare because after Ms. Sistrunk told her to take the victim to the hospital, Defendant Williams first ran several errands, including applying for a job, going out to eat, and going to Walmart. He estimated that Defendant Williams waited 18 to 20 hours before taking the victim to the hospital. Mr. Harrell acknowledged that Ms. Sistrunk did not call an ambulance for the victim. Mr. Harrell also acknowledged that the victim's injuries at the hospital appeared more severe than at the time Ms. Sistrunk photographed the victim.

The State exhibited the victim's medical records from the hospital and from Rainbow Kids Clinic, the victim's primary care provider.

Doctor Emily Fain, a physician of pediatric emergency medicine at the hospital, testified as an expert in pediatric medicine. She was working at the emergency room when the victim arrived "covered in bruises." She photographed the victim's injuries, which included: "swelling and bruising around both of her eyes" to the point that "they [we]re nearly swollen shut"; "bruising all over her face"; "swelling to the side[s] of her face," "extending down to the front of her ear"; a "[s]ignificant number" of bruises to her back, arms and legs, and abrasions to her forehead, nose, cheeks, around her mouth, lips, left shin. Doctor Fain described the victim as quiet, noting that it can be "hard to know for sure" why a child is quiet, whether it be "because they are nervous and in an unfamiliar setting" or "because they are injured and they are in pain." Doctor Fain ordered a CT scan of the victim's head and face, a "skeletal survey, which is a series of about 22 to 25 . . . images that basically x-ray every bone in the body," and "some blood work." From the x-rays Doctor Fain discovered a fracture to the victim's femur. A pediatric radiologist also found "additional injuries." Doctor Fain said that Defendant Williams told the medical team that the victim "had fallen two days prior and had gotten some bruising on her forehead," but Doctor Fain concluded that the victim's injuries were abusively inflicted

and were not the "result of an accident." She referred the victim to a care team of child abuse specialist pediatricians.

During cross-examination by Defendant Sweeney, Doctor Fain said that she could not determine what caused the victim's injuries and acknowledged that "falls can cause fractures." She also acknowledged that the scrape on the victim's nose could "be consistent with a fall." She said that it was "not possible to date bruising."

During cross-examination by Defendant Williams, Doctor Fain testified that she had been specially trained to identify injuries to children that were the result of abuse. She acknowledged that "there are some genetic factors that can lead people to bruise more easily" but said that a person's "being anemic does not affect how someone bruises." She acknowledged that a low platelet count could lead to a person's bruising easily. She reiterated that she could not determine when a bruise occurred. She also said that she could not determine whether the scratches on the victim's face were sustained at the same time as the bruising and swelling. As to the femur fracture, Doctor Fain said that if the victim "was not walking, that would be concerning that there would be a more serious injury underneath the bruise."

On redirect examination, Doctor Fain testified that the victim had "a normal platelet count" and nothing else that indicated that the victim bruised more easily than normal. She said that the extent of the victim's injuries "would not be caused by a single fall" and that "[f]alling and hitting a flat surface would not cause" the swelling to the victim's eyes. She explained that "a fracture causes pain[,] and I would expect the child to cry."

Quintora Smith, who lived at the Kings Inn in July 2018, testified that she knew Defendant Williams from living at the same hotel. The two saw each other outside and began talking. She said that the defendants lived at the hotel together with the victim, although Ms. Smith "barely" saw the victim. She said that "[t]he last time I s[aw the victim,] she couldn't walk. . . . [S]he had hair missing. She was bruised up. And when [the victim] did see me, she always d[id] the sign language to let me know that she was hungry." Ms. Smith gave the victim food, noting that "at first I used to give [the defendants] food to give to [the victim], but I wasn't trusting that. So I gave her food myself." She clarified that she never saw the victim walk, rather Defendant Williams was always carrying her. She said that the victim's hair was so thin, "I thought she had a cancer." She asked Defendant Williams what was "wrong with" the victim's feet, and Defendant Williams told her that the victim had gotten an infection from the mold and bacteria in the bathtub at a previous hotel. Ms. Smith said that the last time that she saw the victim, the victim had "a bruise around her eyes" and said that when she asked about

-7-

it, the co-defendants told her that the victim had fallen. Ms. Smith said that her sister routinely visited her and that her sister called DCS about the victim's injuries.

Ms. Smith said that Defendant Sweeney owned a blue truck that he used for a mobile detailing business and that Defendant Williams worked with Defendant Sweeney. Ms. Smith said that Defendant Williams only spoke with her when Defendant Sweeney was not around and that Defendant "Sweeney wouldn't never let her talk for herself." She said that she routinely saw the defendants return from Taco Bell or Jack in the Box with food for two people but never "food for a third person" or a kid's meal. She also saw them routinely leave the hotel room without the victim.

During cross-examination by Defendant Sweeney, Ms. Smith testified that people lived at the hotel and routinely hung out on the balcony. She said that she and Defendant Williams would speak to each other while outside on the balcony but that she never visited the defendants' room. She said that Defendant Sweeney would also sometimes speak to her while outside. Ms. Smith denied ever hearing the victim cry, reiterating that the victim did not speak, "just did that sign language that she was hungry."

During cross-examination by Defendant Williams, Ms. Smith said that the first time that she met Defendant Williams and the victim, she was sitting outside eating when Defendant Williams approached her. Ms. Smith asked Defendant Williams what the victim's gesture meant, and Defendant Williams told her it meant the victim was hungry. After learning the victim was hungry, Ms. Smith "just fed her." She estimated that this interaction was sometime in June. She said that she saw the victim "three or four" times. She said that if Defendant Sweeney "was around, you don't see [the victim] and you barely see [Defendant Williams]." Ms. Smith acknowledged that she never saw either defendant "be physical with the child," other than Defendant Williams' carrying the victim "because she couldn't walk."

Shantora Covington, Ms. Smith's sister, testified that during the summer of 2018, she visited Ms. Smith at the Kings Inn "[e]very day or every other day." During those visits, she saw Defendant Williams "[e]very once in a while" "sitting on the porch." She said that anytime Defendant Sweeney came around, Defendant Williams would leave. On one occasion, Ms. Covington came to visit Ms. Smith and was sitting in her vehicle when she saw the two defendants get out of a car with the victim. Ms. Covington saw that the victim "had big bruises on her back, a bruise on her leg," "bruises on her face, her hair was missing, and she had a black eye." She said that the bruise on the victim's leg was larger than a softball. Ms. Covington said that she called the police and reported what she had seen.

-8-

During cross-examination by Defendant Sweeney, Ms. Covington said that when she saw the victim with bruises it was shortly after 3:00 p.m. She said that the victim was approximately between four and eight feet away when she saw her and that the victim was wearing a t-shirt and a diaper at the time.

Stephen Williams, the victim's father, testified that the victim was born August 18, 2016. He said that he had known Defendant Williams since middle school and that they married in 2016, sometime before the victim's birth. He and Defendant Williams separated "about a year and a month" after the victim was born. Defendant Williams moved out and took the victim with her in October 2017. The couple took turns caring for the victim "starting out every other week. And next thing I know I would have her three weeks and she would have her a week and just bouncing all over the place with her." Mr. Williams had the victim "from Christmas [2017] to April 23rd [2018]," during which time he "barely heard from" Defendant Williams. On April 23, Defendant Williams asked if the victim could stay with her for a week, and Mr. Williams consented, but Defendant Williams kept the victim for three months. Mr. Williams said that when the victim left his care in April 2018, she did not have any bruises or injuries. He said that he tried to contact Defendant Williams after she took the victim but said that she did not respond to his repeated texts and calls requesting to see the victim. Defendant Williams sent Mr. Williams photographs of the victim on June 6 and 9, 2018. From the photographs, Mr. Williams saw that the victim had a bruise on her forehead and left arm and a swollen lip. He also noted that it appeared that the victim seemed to have "lost a lot of weight." Mr. Williams did not see the victim again until she was admitted to the hospital. He also said that prior to April 23, the victim ate well, "was talking some words," crawled and walked, had a full head of hair, and used a "[l]ittle bit of sign language" to ask for food.

Because Defendant Williams did not allow Mr. Williams to see the victim for three months and because he was worried about her, Mr. Williams "hired a private investigator" to try to locate the victim. Mr. Williams learned that the co-defendants and the victim were at the Kings Inn, and Mr. Williams went there to find the victim. When he arrived, he saw Defendant Sweeney on the balcony but did not speak to him.

Mr. Williams said that when he got to the hospital, he "started breaking down and crying" when he saw the victim. Defendant Williams met Mr. Williams "in the parking garage" of the hospital and told him that the victim "fell on her face" and "broke her femur." He said that Defendant Williams was acting as though "she was trying to cover something up." When he first arrived, Mr. Williams was not permitted into the victim's room until after he met with Mr. Harrell, the DCS worker. He said when he first saw the victim, he noticed that "[s]he ha[d] lost a lot of weight," was "bruised up," and looked nothing like she did when he last saw her April 23, 2018. He said that when he first entered

the victim's hospital room, "she was skittish" and took "about an hour or two to get used to me being in the room," which he said was unusual behavior. The victim was in the hospital for approximately one week, during which time she largely "kept to herself." Mr. Williams said that it took the victim over one month for her to seem herself again. Prior to April 23, Mr. Williams took the victim to the doctor for an episode of hand-foot-and-mouth disease and again for her 18-month checkup on April 3, 2018.

Doctor Elizabeth Copenhaver testified as an expert in pediatric medicine. She said that she was a pediatrician working at the hospital when the victim was brought in. She said that she was specially trained to determine between accidental versus abusive injuries to children and was assigned to the victim's child abuse response and evaluation ("CARE") team. Doctor Copenhaver said that in reviewing the victim's medical records from her primary care physician, she saw that on May 21, 2018, Defendant Williams contacted the clinic and expressed "concerns for some bruising and poor feeding or eating" and that the clinic had recommended the victim be seen in their office. The victim's records, however, indicate that the last time the victim was seen in the clinic was for her 18-month checkup on April 3, 2018.

Doctor Copenhaver testified that the victim had a subgaleal hematoma, or "a pooling of blood on the scalp," and bruising around her eyes that would have been "obvious to a prudent caregiver." She explained that the subgaleal hematoma to the scalp could have caused the pooling of blood around the eyes. The victim had a subconjunctival hemorrhage to her left eye, which indicated trauma to the eye. The victim also had "some scratches on her nose as well as a bruise to her lower lip," and "scratches to her [right] ear." Doctor Copenhaver also said that the victim had hair loss and "truncated hair," which she described as hair that had "broken off ends," "just like all different lengths [with] no rationale as to why they were different lengths." She said that the victim's facial injuries were inconsistent with a simple fall.

Doctor Copenhaver said that the victim had a "skeletal survey" done, which took "images of every section of the body" "to evaluate if there are . . . any new or healing fractures." She explained that the images would show signs of fractures that had begun the healing process. She said that fractures that had begun healing were at least seven to 10 days old, whereas fractures that showed no signs of healing occurred within the last 10 days. Doctor Copenhaver and the victim's care team found 16 fractures, including to the victim's left and right hip bones, left heel, left tibia, left fibula, left and right radii, left and right ulnae, left humorous, ninth rib, right fourth and fifth metatarsals, left third and fourth metatarsals, and left femur. All of the fractures were in various states of healing other than the fractures to the metatarsals and left femur, which Doctor Copenhaver described as "acute." The care team also found two areas of concern in which the images were

-10-

inconclusive as to whether there had been fractures, one to the victim's T-4 and T-5 vertebrae in her spine where "there was some wedging or areas where the vertebrae were not uniformly shaped," and the other to the victim's left cuboid bone in the foot. Doctor Copenhaver said that the fact that the fractures were in various stages of healing indicated to her that "there were multiple instances of trauma," which "is a very concerning sign for child physical abuse." She also said that the victim's numerous fractures were inconsistent with a fall and that the injuries would have been noticed by a prudent caregiver because the victim would have expressed pain during daily activities. She said that it was "likely" that the victim was in pain from the untreated fractures. Doctor Copenhaver said that the victim's blood test indicated that the victim did not have any condition that would cause her bones to fracture easily.

In addition to the victim's multiple fractures, Doctor Copenhaver discovered extensive bruising all over the victim's body, including "on her face, her lip, her back, her right arm, her left arm, her right leg, and her left leg." Doctor Copenhaver testified that the extent of the victim's bruising was indicative of child abuse and inconsistent with a normal fall. She found several "abnormalities" to the victim's frenulum, "the soft tissue skin that goes between your upper lip and . . . where your teeth are." She said that the injury to the victim's upper lip "had signs of healing" but that the lower lip "had just an abnormal presentation," having "bumps" rather than "a smooth line that you typically see in kids." She said that the injuries to the victim's mouth were consistent with something being forcibly inserted into her mouth and that she was concerned any time a child has "any injury to a mouth without an appropriate story to explain how it got there." She also said that the victim's weight was concerning for malnutrition, noting that at the victim's checkup on April 3, 2018, the victim weighed 30.25 pounds and was in the 98th percentile for growth, but when the victim was admitted to the hospital on July 13, 2018, she weighed only 22 pounds and nine ounces and was in the 23rd percentile for growth. Doctor Copenhaver determined that the victim had been neglected nutritionally and said that this type of weight loss in a young child can lead to serious medical issues. In light of all of the victim's injuries, Doctor Copenhaver determined that the victim had suffered medical neglect.

During cross-examination by Defendant Sweeney, Doctor Copenhaver acknowledged that she did not speak to Defendant Williams about the victim's injuries. She said that the victim was admitted to the hospital on July 13, and she did her consult on July 16. She acknowledged that the pooling of blood around the victim's eyes could have changed during those three days but that she referenced photographs taken of the victim at the time of her admission to compare. She acknowledged that the victim received a cast for the fracture to her right femur but that none of her other fractures were treated. She also acknowledged that there are different types or degrees of fractures and that not all

-11-

fractures cause immobility or disuse of that part of the body. Doctor Copenhaver said that malnutrition can cause hair loss and acknowledged that some children pull at their hair and ears or scratch themselves.

During cross-examination by Defendant Williams, Doctor Copenhaver testified that one of the victim's skeletal surveys was done at 12:55 a.m. on July 14, 2018, a few hours after she was admitted to the hospital. She said that it is possible for a bone fracture to have no external indicator on the body such as a bruise or swelling but that she would expect "[a] change in a child's behavior such as not wanting to use an arm or a leg in the way they previously did before the injury." She estimated that the victim's acute fractures occurred within "the past 7 to 10 days" but said that she could not be more specific to the time frame of the injuries. She acknowledged that Defendant Williams "did eventually bring [the victim] to the hospital" to seek treatment for her injuries. Doctor Copenhaver said that it was possible that the victim sustained the scrapes and bruising to her face in a single incident but said that she could not make that determination. She acknowledged that the scrape on the victim's face could have been caused by a fall. She reiterated that she could not determine when the victim sustained each of her bruises. She acknowledged that it may not be necessary for a caregiver to seek medical care for a child if there is no "change to her skin or behavior change" after an incident.

Doctor Copenhaver acknowledged that when Defendant Williams reached out to the victim's primary care provider, she expressed concern for the victim and that the clinic did not recommend taking the victim to the emergency room or to have her seen immediately. She said that she could not determine whether delayed medical treatment caused any long-term problems for the victim. She also acknowledged that "[l]ots of things" can affect a child's eating habits.

During redirect examination, Doctor Copenhaver reiterated that the victim suffered 16 fractures and significant weight loss between her April 3, 2018 checkup and her admission to the hospital on July 13, 2018. She said that the fractures would have caused the victim to be in pain and that prompt medical treatment could have reduced the victim's pain. She also said that early intervention for weight loss "[p]otentially" could have prevented further weight loss. She calculated that at the time of her admission to the hospital, the victim weighed approximately three pounds less than she weighed 10 months prior at her 12-month checkup. Doctor Copenhaver concluded that based on the totality of the victim's injuries, she suffered multiple instances of physical abuse and medical and nutritional neglect.

During further cross-examination by Defendant Williams, Doctor Copenhaver testified that weight loss "is an abnormal finding in [a] child." She

-12-

acknowledged that the victim did not suffer injuries from malnutrition.

The State rested. Defendant Williams elected to testify.

Defendant Williams, the victim's mother, testified that she was in a relationship with Mr. Williams from November 2013 to September 2017, at which time the couple separated. She said that she met Defendant Sweeney in June 2017 and later began a relationship with him. She said that she and Mr. Williams maintained a co-parenting relationship "for a period of time." She said that she took the victim to the doctor many times and denied that she failed to seek medical care if she noticed any concerning issue. She said that she saw Defendant Sweeney hit the victim on one occasion when "[h]e popped her on the back of her hand." She said that she began noticing that the victim was bruising but had not observed any incidents that would have caused bruising. She denied that she had any reason to know that the victim had fractured bones and said that if she had known about any fracture, she would have sought medical care. She said at the time that she contacted the victim's primary care provider about her bruising, she did not believe that the victim was being physically abused and instead "thought she had anemia."

Defendant Williams said that she first noticed the bruising around the victim's eyes on the same day that she took her to the hospital. She said that she allowed the police into the hotel room the previous day to conduct a wellness check and that the victim did not have bruises around her eyes at that time, only "a little discoloration where she fell and she had a little goose egg." Defendant Williams said that she had no reason to think that the bruising around the victim's eyes could have been caused by her hair being pulled out. She said that if she had known that the victim's hair had been pulled so hard that it caused eye bruising, she "would have called the police immediately." She said that at the time that the victim was admitted to the hospital and she learned about the fractured femur, she believed that the victim sustained the injury in a fall because at the time she did not know of any other incidents that could have caused the injury. She said at that time, she and Defendant Sweeney were the victim's only caregivers.

Defendant Williams said that her relationship with Defendant Sweeney "started out good. Then got a little rocky. And then it just got flat out terrible." She explained that Defendant Sweeney "started showing anger, more anger than usual" with "random outbursts . . . over little things, and it was always my fault." The problems escalated to "where we would fight every day. He would verbally abuse me. He would emotionally abuse me. It was a couple times he put his hands on me." She said that Defendant Sweeney convinced her to leave her job at a Mapco and work with him and that he controlled what she did. Defendant Sweeney's truck "was the only mode of transportation we had, . . . [and] we went to jobs together." Defendant Sweeney allowed

-13-

her to go only "to the grocery store and maybe out to a restaurant" without him. She said that Defendant Sweeney also did not allow her to see her family or friends. She reiterated that despite Defendant Sweeney's treatment of her, she did not believe at that time that he was abusing the victim and said that if she had thought that was happening, she would not have allowed the victim to remain with him. Defendant Williams said that she tried to leave Defendant Sweeney but that each time that she texted someone to come get her, "he would take my phone from me and not let me have it back . . . until he made me either message them back and say don't come or that we worked things out."

Defendant Williams said that as soon as she realized the severity of the victim's injuries, she took her to the hospital. She said that once she learned the extent of the victim's injuries and understood the medical implications, she believed that Defendant Sweeney had been physically abusing the victim because he was the victim's only other caretaker. She said that there were occasions when Defendant Sweeney was alone with the victim and that the victim was not with anyone but her and Defendant Sweeney during the time the injuries occurred. She said that she had no other explanation for the victim's injuries. She denied that she ever hit the victim in a way that could have caused her injuries, stating, "I barely even spank her." She said that the victim "had a scrape on her nose and a scrape on her forehead" immediately after she fell and that the following morning, she noticed some bruises which she also thought were from the victim's falling.

During cross-examination by the State, Defendant Williams said that Mr. Williams had always been an active part of the victim's life and acknowledged that she lied to the detectives about his care of the victim. She said that "[t]wo or three times a week," Defendant Sweeney "would have me leave [the victim] with him if I would go to the store or go get something to eat" and that he was alone with her during those times. She said that if the victim got a bruise or a "knot" while with Defendant Sweeney, he always had an explanation for the injury, such as telling her that the victim fell down the stairs. Defendant Williams acknowledged that she sent pictures of bruises to the victim's left eye, right cheek, and right ear to a friend at the end of April 2018. She said that Defendant Sweeney told her that the victim had fallen and sustained those bruises. She acknowledged that she continued to leave the victim in Defendant Sweeney's care even after noticing the bruising. She also acknowledged telling her friend that Mr. Williams wanted to see the victim but that she did not want the victim to go back to him with bruises. She acknowledged that on May 17, 2018, she sent her friend a photograph of the victim with bruising on the left side of her face and on May 20, 2018, of the victim's red and swollen left arm. She said that she told her friend that the injury to the victim's arm was from Defendant Sweeney's "popping" her hand "repeatedly." She said that she did not take the victim to the doctor after the victim's primary care provider recommended that she be seen for bruising because Defendant Sweeney would not allow her to do so.

-14-

During cross-examination by Defendant Sweeney, Defendant Williams testified that she and Defendant Sweeney lived together from July 14, 2018, until September 4, 2018. She said that she had her own telephone that had a passcode but that Defendant Sweeney knew the passcode. She acknowledged that she was away from Defendant Sweeney at times but stated that she did not call for help during those instances because "[h]e would never let me leave when there was tension between the two of us. It was almost like he was afraid I would take his truck and not bring it back." She said that she called people to come get her but that Defendant Sweeney always intervened and prevented it, saying, "He would take my phone and he would act like he was me." She acknowledged that she lied during her interview at the hospital, explaining that she was scared. She acknowledged that Defendant Sweeney had physically assaulted her on at least two occasions by "chok[ing] me" and "slapp[ing] me in the face" but reiterated that she did not know that he was abusing the victim.

Defendant Williams acknowledged that Ms. Sistrunk told her that the victim needed to see a doctor that day. She acknowledged that she waited 10 to 12 hours to take the victim to the hospital but said that it was "[n]ot by choice," explaining that Defendant Sweeney would "not allow me to." She described an incident that occurred on July 11, 2018, in which Defendant Sweeney "grabbed [the victim] by the legs and pulled her to the end of the bed and put her on the floor." She said that Defendant Sweeney did not "yank" the victim but that it also "wasn't a gentle pull either."

Defendant Sweeney elected not to testify and did not put on additional proof.

On this evidence, the jury convicted both defendants as charged of aggravated child neglect of a child age eight or less. After a sentencing hearing, the trial court sentenced each defendant to 25 years.

Defendant Williams filed a timely but unsuccessful motion for new trial. Defendant Sweeney failed to file a timely motion for new trial, *see* Tenn. R. Crim. P. 33(b) ("A motion for a new trial shall be in writing . . . within [30] days of the date the order of sentence is entered."), but filed a timely petition for post-conviction relief seeking a delayed appeal on the ground of ineffective assistance of counsel for his trial counsel's failure to file a motion for new trial, *see* T.C.A. § 40-30-113(a)(3). The trial court conducted a partial *Strickland* analysis and found that Defendant Sweeney's trial counsel performed deficiently by failing to timely file a motion for new trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("[T]he defendant must show that counsel's performance was deficient . . . ." and "that the deficient performance prejudiced the defense."). As to the prejudice prong of the *Strickland* analysis, however, the trial court

-15-

applied *Wallace v. State*, 121 S.W.3d 652 (Tenn. 2003), *overruled by Howard v. State*, 604 S.W.3d 53 (Tenn. 2020), and concluded that prejudice was presumed by counsel's error. *See Wallace*, 121 S.W.3d at 658. The trial court granted Defendant Sweeney's request for a delayed appeal, and Defendant Sweeney filed a motion for new trial, which was subsequently denied.

> Our Code provides for a delayed appeal in limited circumstances.
>
> When the trial judge conducting a hearing pursuant to this part finds that the petitioner was denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of Tennessee and that there is an adequate record of the original trial proceeding available for a review, the judge can . . . [i]f no motion for a new trial was filed in the original proceeding, authorize a motion to be made before the original trial court within thirty (30) days.

T.C.A. § 40-30-113(a)(3). In *Wallace*, our supreme court held that counsel's failure to file a motion for new trial on behalf of a defendant who desired to appeal was "presumptively prejudicial" and that the defendant was not "required to demonstrate actual prejudice." *Wallace*, 121 S.W.3d at 658. Our supreme court has since explicitly overruled *Wallace* and held that to grant post-conviction relief in the form of a delayed appeal on a claim of ineffective assistance of counsel for failure to file a motion for new trial, the trial court must adhere to both prongs of the *Strickland* analysis and find not only that counsel performed deficiently but also that the deficient performance resulted in actual prejudice to the defendant. *Howard*, 604 S.W.3d at 63.

Here, the trial court failed to properly consider whether counsel's deficient performance in failing to file a motion for new trial prejudiced Defendant Sweeney. We conclude that it did not. Two of Defendant Sweeney's issues on appeal, sufficiency of the evidence and sentencing, need not be raised in a motion for new trial because the relief sought is not a new trial. *See State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989) ("[T]he failure to timely file a motion for a new trial results in the waiver of those issues which may result in the granting of a new trial."); *see also* Tenn. R. App. P. 3(e) (excluding sufficiency of the evidence and sentencing issues from issues which must first be raised in a motion for new trial as a prerequisite to appellate plenary review).

Defendant Sweeney's issue of election of offenses, even if not waived for failure to object at trial or raise it in a timely motion for new trial, is meritless because our supreme court has explicitly held that aggravated child neglect is not an offense for which

-16-

the doctrine of election of offenses applies. *State v. Adams*, 24 S.W.3d 289, 296 (Tenn. 2000). Aggravated child neglect is a "continuing course of conduct" that "continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect." *Adams*, 24 S.W.3d at 296 ("[I]t would be an absurd construction to hold that criminal child neglect is complete as soon as the child's health and welfare are first adversely affected . . . ."). The offense of child neglect "simply does not lend itself to division into segments of discrete acts each having various points of termination." *Id.* Consequently, the doctrine of election of offenses is inapplicable even when "multiple injuries have arisen out of one continuing period of neglect." *Id.*

Because Defendant Sweeney has failed to establish that trial counsel's failure to file a timely motion for new trial deprived him of the opportunity to raise a valid claim on direct appeal, the trial court erred by granting Defendant Sweeney post-conviction relief in the form of a delayed appeal. As we have explained above, Defendant Sweeney's claims of insufficient evidence to support his conviction and error in sentencing are not waived by his failure to timely file a motion for new trial, and we consider those issues below. His claim that the State failed to make a proper election of offenses is waived because it was not raised in a timely motion for new trial and because, as the defendant concedes, he failed to object to the issue at trial. However, as we have explained, this issue was meritless.

Both defendants filed timely notices of appeal. In this appeal, Defendant Sweeney argues that the evidence was insufficient to support his conviction because he lacked custodial authority over the victim and that the trial court erred by applying certain enhancement factors and sentencing him to 25 years. Defendant Williams argues only that the evidence was insufficient to support her conviction.

## I. Sufficiency

Both defendants argue that the evidence adduced at trial was insufficient to support their convictions.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of

-17-

the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated child neglect occurs when a person commits the offense of child neglect, and the neglect "results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). Child neglect occurs when "[a]ny person . . . knowingly abuses or neglects a child . . . so as to adversely affect the child's health and welfare." *Id.* § 39-15-401(b). "'Serious bodily injury to the child' includes, but is not limited to, . . . a fracture of any bone . . . [and] injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement . . . ." *Id.* § 39-15-402(c). The offense of aggravated child neglect is a Class A felony "if the . . . neglected . . . child is eight (8) years of age or less." *Id.* § 39-15-402(b).

To establish that a defendant neglected a child, "the State must first prove that a defendant owes a legal duty to the child." *State v. Sherman*, 266 S.W. 3d 395, 404 (Tenn. 2008) (citing *State v. Mateyko*, 53 S.W.3d 666, 671 (Tenn. 2001)). A parent, guardian, or someone who otherwise stands in loco parentis to a child owes that child a legal duty and "may be subject to criminal liability for child neglect." *Id.* at 405. The "key element" in determining whether a person is in loco parentis to a child is "whether the adult intended to assume parental duties." *Id.* at 406 (citing *Morlock v. Dorchester Cnty. Fam. YMCA, Inc.*, 779 A.2d 963, 967 (Md. 2001)). Intent may be inferred from circumstantial evidence, including "the child's age, the child's dependence upon the person claimed to be in loco parentis, and whether that person supports the child and exercises the duties and obligations of a natural parent." *Id.* at 407 (citing *Gritzner v. Michael R.*, 611 N.W.2d 906, 919-20 (Wis. 2000)).

In our view, the evidence, taken in the light most favorable to the State, sufficiently supports both defendants' convictions. As to Defendant Williams, she is the victim's mother, and the victim was in her custody at the time the victim sustained her injuries. Sometime between April 23 and July 13, 2018, the victim sustained at least 16 fractures, and at least 11 of those had occurred more than seven days prior to the victim's being brought to the hospital. The evidence established that the victim would have been in pain from the fractures and that, although nonverbal, she would have indicated her pain and discomfort during daily activities. Furthermore, the victim had severe bruising all over her body, and Defendant Williams was aware that the victim was sustaining significant bruises as early as the end of April 2018, when she sent her friend pictures of bruises on the victim. She was also aware that the victim continued to sustain bruising because she

-18-

sent her friend pictures again on May 17 and 20, 2018. Defendant Williams reported the victim's bruising to the victim's primary care provider on May 21, 2018, but failed to seek medical care for the victim at that time despite the clinic's recommendation that she do so. On July 13, 2018, the victim had bruising and swelling to her eyes and swelling on her forehead, and Ms. Sistrunk, a DCS employee, told Defendant Williams to take the victim to the hospital "right away," but Defendant Williams did not seek medical care for the victim for another 18 to 20 hours. This evidence is more than sufficient to establish that Defendant Williams committed aggravated child neglect.

Defendant Sweeney argues that the State failed to prove that he owed the victim a legal duty. We disagree. The evidence established that Defendant Sweeney was in a relationship and lived with the victim's mother. The infant victim lived with the couple beginning on April 23, 2018. Defendant Williams and Defendant Sweeney were the victim's only caregivers during that time, and Defendant Sweeney was the victim's sole caregiver on numerous occasions when Defendant Williams went out. This is sufficient to support the jury's finding that Defendant Sweeney stood in loco parentis to the victim.

## II. Sentencing of Defendant Sweeney

Defendant Sweeney argues that the trial court erred by applying enhancement factors four, that the victim was particularly vulnerable, and five, that he treated the victim with exceptional cruelty, and by imposing the maximum sentence. The State contends that the trial court did not abuse its discretion.

At the bifurcated sentencing hearing,[3] Juanita Dickens, Defendant Sweeney's mother, testified that Defendant Sweeney had "always been an outstanding young man" and "helped everybody." She had seen Defendant Sweeney around his nieces and nephews who "all loved him dearly." She did not know that the victim was living with him.

During cross-examination by the State, Ms. Dickens said that Defendant Sweeney told her that he did not know what had happened to the victim and that he was working one day and came home to find the victim "in the shape she was in" with "bruises all over her" and that Defendant Williams told him the victim had fallen down the stairs.

During cross-examination by Defendant Williams, Ms. Dickens testified that Defendant Sweeney had a son whom he was just getting to know. She said that she was unaware that Defendant Sweeney's son and his son's mother had obtained an order of

---

[3]     The trial court held a sentencing hearing on February 18, 2022, at which hearing the court heard evidence. The court continued the hearing to allow the defendants time to respond to the State's last-minute sentencing memorandum. The court resumed the hearing and imposed sentences on April 1, 2022.

protection against Defendant Sweeney because of threats and acts of violence.

Defendant Sweeney testified that he "didn't feel any responsibility" toward the victim, that he "didn't feed her or anything like that," and that Defendant Williams was solely responsible for disciplining the victim. He said that he "didn't have any part of [the victim's] getting injured" and that he "wasn't even there when she fell." He denied that his son's mother had obtained an order of protection against him.

During cross-examination by the State, Defendant Sweeney said that all he knew was that the victim had fallen when he was not around and that she sustained a "bump on her head" and a "bump over her eyes." He denied that he or Defendant Williams did anything to cause the victim's injuries.

During cross-examination by Defendant Williams, Defendant Sweeney again denied that he was subject to an order of protection and said that when he was getting to know his son, his son's mother was present but that the visitation was not supervised by the courts. He said that on the day that the victim fell, he and Defendant Williams were arguing when he stopped his truck at a gas station. Defendant Williams got out of the truck, took the victim and the victim's car seat, and "started off running."

The trial court determined Defendant Sweeney to be a Range I offender and applied the following enhancement factors: factor four, that the victim "was particularly vulnerable because of age or physical or mental disability," and factor five, that "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," *see* T.C.A. § 40-35-114(4), (5), and applied "great weight" to both factors. The court applied no mitigating factors. In applying enhancement factor four, the trial court found that the victim was between the ages of 19 and 22 months at the time of the offense and "was helpless to escape the neglect and was only minimally verbal and could thus neither summon help nor testify at a later date." To support this conclusion, the trial court pointed out that Doctor Fain described the victim as "quiet," that the victim asked Ms. Smith for food by communicating in sign language, and that Mr. Williams described the victim as "skittish when he first saw her in the hospital."

In applying enhancement factor five, the trial court found that "the victim's multiple and untreated injuries, severe pain, attendance of those injuries, and extreme hunger resulting from nutritional neglect" constituted "cruelty over and above what is required to sustain a conviction" for aggravated child neglect. To support this conclusion, the court pointed to the victim's "multiple untreated bone fractures in a period between May and July 2018, [that] caus[ed] her to suffer extended and unnecessary pain and suffering," the victim's being "forced to walk with five fractures in both of her feet and

-20-

three fractures in her left leg," the victim's "extensive facial swelling and bruising from a subgaleal hematoma likely caused by pulling of the child's hair," the victim's body being "covered in bruises," and the victim's loss of "approximately 26 percent of her body weight in over three months."

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Our supreme court has previously held that even when age is an essential element of an offense, the court may nonetheless apply the "particularly vulnerable" enhancement factor because "the relevant inquiry is not simply whether the victim is under [a certain age], but instead whether the victim was *particularly vulnerable* because of age or physical or mental disability." *State v. Walton*, 958 S.W.2d 724, 729 (Tenn. 1997) (quoting *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993)). In considering whether a victim is particularly vulnerable, the court should consider "whether the victim, because of age or mental or physical attributes, was particularly unable to resist the crime, summon help, or testify at a later date," "whether [the] victim's age (extremely old or extremely young) is entitled to additional weight," and "whether the vulnerability of the victim made the victim more of a target for the offense or, conversely, whether the offense was committed in such a manner as to render the vulnerability of the victim irrelevant." *Id.* (citing *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)).

To establish that a defendant treated a victim with exceptional cruelty, the trial court must find that the cruelty inflicted was "'over and above' what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Winfield*, 23 S.W.3d 279 (Tenn. 2000)). The evidence must "denote[] the infliction of pain or suffering for its own sake or from the gratification derived

therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *Id.* (alteration in *Arnett*) (quoting *State v. Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App., Jackson, Mar. 14, 2000)). The exceptional cruelty enhancement factor may apply even when serious bodily injury is an element of the offense. *See Haynes*, 2000 WL 298744, at *3 (upholding application of exceptional cruelty enhancement factor when "the appellant's conduct established not only the infliction of serious bodily injury but also a calculated indifference toward suffering").

In our view, the trial court did not err by applying these enhancement factors. The victim was under two years of age during the period of neglect. She was wholly dependent on caregivers for her daily needs, including feeding, diapering, and bathing. She was largely non-verbal, and other than her ability to sign that she was hungry, there is no evidence that she was able to ask for help. This supports the trial court's application of enhancement factor four, that the victim was particularly vulnerable. The victim also suffered multiple painful and serious injuries far beyond what is necessary to establish serious bodily injury for a conviction. Any one of the victim's injuries would have been enough to satisfy the statutory element for a conviction. The neglect of the victim continued for some time as evidenced by her multiple untreated fractures in different stages of healing and the bruising that began as early as late April 2018. The young victim suffered neglect for, at a minimum, a nearly-two-month span, during which time she suffered numerous, intentionally-inflicted bruises and fractures that went untreated. This supports the trial court's application of enhancement factor five, that Defendant Sweeney treated the victim with exceptional cruelty.

As to the length of Defendant Sweeney's sentence, the trial court properly considered the purposes and principles of our Sentencing Act and, consequently, did not abuse its discretion in imposing the within-range sentence.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE